Argued before VAN BRUNT, P. J., and BARRETT and PATTERSON, JJ.
*Theodore B. Gates*, for appellant.     *B. Estes*, for respondent.

BARRETT, J.     There is nothing in sections 1022 and 1023 of the Code of
Civil Procedure which deprives the court of power to require proper findings.
These sections undoubtedly change the former practice, whereby findings orig-
inally insufficient in form or indefinite in substance might be clarified upon
the settlement of the case.     This was all that was decided in *Gormerly* v.
*McGlynn*, 84 N. Y. 284, where the revisers' note to section 1023 was referred
to, and their view was seemingly approved,—that the method of proceeding
by motion to compel findings, where the referee refuses to make them at all,
has not been abolished.     Cases where the power in question has been denied
have proceeded either upon a misapprehension of what was decided in *Gor-
merly* v. *McGlynn*, or upon a too narrow view of what was contemplated by
sections 1022 and 1023.     We have no doubt that the special term has power,
in the interest of justice, to add to the findings made by it, and we think it
equally clear that the court may remit his findings to a referee for a similar
purpose.     We so held in *Schultheis* v. *McInerny*, 13 N. Y. Supp. 684, and we
see no reason for altering the opinion there pronounced.     This is a power
which is so far inherent that it would require an express prohibition to de-
prive the court of its exercise.     It is analogous to the power always exercised
by the court over its judgments, records, and proceedings in the interest of
justice.     In the present case, the application should have been granted.     The
finding that the plaintiff rendered services for the testator which the latter
paid in full is too indefinite to raise the questions presented.     The referee
should have found specifically on each of the items of the plaintiff's demand,
and then he should have specifically found the amount paid.     The order should
be reversed, with costs, and the motion granted.     All concur.

---

### COOK *v.* NEW YORK CENT. & H. R. R. CO.

*(Supreme Court, General Term, Third Department.    February 4, 1891.)*

RAILROAD COMPANIES—INJURIES AT CROSSING—NEGLIGENCE—EVIDENCE.

In an action against a railroad company for negligently killing a traveler at a
highway crossing, it appeared that, when deceased was at a point whence he
could see the track, defendant's train was not in sight, and that for the rest of the
distance the view was obstructed.    Defendant did not give the signals within the
distance required by law.    Near the crossing was another railroad, so that it would
be difficult for a traveler to determine from the sound of an approaching train on
which track it was.    *Held*, that the case was for the jury.

Appeal from special term.

Katie Cook sued the New York Central & Hudson River Railroad Company
to recover for personal injuries.    From a judgment for plaintiff, defendant
appeals.

Argued before LEARNED, P. J., and MAYHAM, J.

*Ashbel Green*, (*J. D. Wendell*, of counsel,) for appellant.    *George S. Klock*,
for respondent.

LEARNED, P. J.     This is an appeal by the defendant from a judgment en-
tered on a verdict in favor of plaintiff, and from an order denying a new trial.
The action was brought to recover damages for the killing of plaintiff's intes-
tate and husband as he was crossing the track of defendant on what is called
"Cox's Highway."     The deceased was driving a horse and wagon northerly
along this highway, and was struck by the engine of a freight train going
westerly on the north track of the West Shore Railroad.     The plaintiff claims
that the train was running about 35 miles an hour; that the whistle was not
blown or the bell rung at the proper distance; and that there were obstructions
which hid the train from the deceased.     The defendant insists that the whistle

was blown and the bell rung, and that the deceased might have seen the train if he had looked. The case was submitted to the jury with great accuracy and clearness. A single exception was taken which was not urged in the appeal, and the requests of defendant were charged by the court.. The questions here presented are those which are continually brought up in such cases,— whether the plaintiff should not have been nonsuited, and whether the verdict should not be set aside as against the evidence. The rules of law applicable are well settled, and have been repeated hundreds of times, to the great waste of printer's ink. And the only point to be decided in such a case as the present is whether the evidence justified the jury in their finding. A full discussion of that seems almost to require a statement at length of the whole of the testimony. Courts have been so much disposed to assume that juries are prejudiced against corporations in such actions as the present that they have often taken it on themselves to determine whether the fact of negligence of each of the parties was shown by the circumstances. The Cox highway approaches the crossing from the south-west at an obtuse angle, for several hundred feet descending at 10 feet in 100, and within about 9 feet of the south track substantially level. The Sanders road comes from the east, and enters the Cox highway south of and close to the railroad crossing. A short distance to the east of the crossing, and between the tracks and the Sanders road, is the passenger station. Further east are the tool-house and shed. About 550 feet east of the crossing the tracks begin to curve southward, at 637 feet they curve more rapidly, and about 987 feet are out of sight. There was a lumber pile in the angle formed by the Cox highway and the Sanders road, which came up to the Cox highway. On the east side of the highway there was a bluff or ridge of hills, which had been cut away for the railroad. The appearance and situation are better understood from the photograph used on the trial than from mere description. There is a watering trough on the west side of the Cox highway, often mentioned in the case; and opposite it, on the east side, five barns and buildings of Mr. Place. There was a vacant lot overgrown lying east of the depot. To understand the relative positions of the train and of the wagon of the deceased, we must notice that the testimony shows that the train was running some 30 miles per hour, and the deceased was driving on a slow trot, which a witness called 2 miles per hour. It was probably rather more, as the road was descending. Assuming that the whistle was blown when the train was on the curve, this would be at a place about 900 feet east of the crossing, and therefore one-third of a minute before the accident. The deceased at that time would have been from 60 to 90 feet away from the crossing. Deceased would have been at the watering trough about a minute or a minute and a quarter before he was struck. The train was then about from 2,640 to 3,300 feet from the crossing,—some 2,000 feet beyond the point where it was out of sight. It is very important to keep these relative positions in mind; for although there were places on the Cox road between the trough and the crossing where the track eastward could be seen, as witnesses testify, yet it will be found that owing to the slow movement of deceased, and the rapid approach of the train, the train may have never been actually in sight of the deceased until just before the accident. Thus the defendant urges that a person at the watering trough could see a train as it rounded the curve. But when deceased was at the watering trough the train had not yet rounded the curve, but was far east of that place; and as the deceased drove along he passed over that part of the Cox highway from which the track was visible, and came to a part where the view was obstructed. Unless we keep the movement of both parties in mind, we shall fail to understand the facts of the case. Thus the train was first in sight from the crossing when about 1,000 feet east, or one-fifth of a mile distant, and at, say, one-third of a minute prior to the collision, when deceased was some 60 to 90 feet from the crossing, where he could see only a small part of the track, on account of the obstruc-

tion of the depot. Of course, the foregoing statements as to the relative positions are not to be taken as absolutely correct, because the speed neither of the defendant nor of the train is known with certainty. They are intended to show that an unobstructed view of the track from a certain point in the highway was of no avail to the deceased unless he was at that part of the highway when the train was on that part of the track; and it seems, as far as we can judge, that in fact the obstructions concealed the train from him until he was close upon the place of danger. Certainly, the jury were justified in coming to such a conclusion. It is further to be noticed that there is evidence that on the day of the accident there was a pile of lumber running some 15 feet north from the wagon-house to the pile now shown in the photograph, which obstructed the view between the Place barns and the depot. And, further, that when a train was coming from the east it was difficult for a person on the Cox highway to determine by the sound whether the train was on the West Shore or on the Central. This is a circumstance to be taken into account in considering the question of the deceased's negligence. If the noise of the train seemed to come from the Central Railroad tracks, the deceased would not have had his attention called to the West Shore road.

Whether the bell was rung or the whistle blown was a question of fact. There was conflicting evidence whether the bell was ringing at the time of the accident; and this was for the jury to decide. And as to the time at which these signals were first given, the defendant's brakeman, who was on the engine, says two long and two short whistles were blown just on the curve, and then he began ringing the bell. The fireman gives the same time for the blowing of the whistle; and the conductor also, and other employes. The engineer says it was just before he rounded the curve in sight of the station. The distance of the curve from the crossing has been above stated. Hence it appears that the signals were not given at the required distance of 80 rods.

Some evidence as to the possibility that the deceased saw the train in time to escape the danger may be derived from the testimony of the defendant's employes on the train in respect to the time when they saw the deceased. One says the horse was on the south rail of the south track; another, that he was 30 feet from that track; another, 2 rods. They say that the engine was then at a point about 260 feet east of the crossing. This, then, was the place where the employes first discovered the deceased; and they were looking in his direction. It took only 6 seconds for the train to pass that distance, running at 30 miles an hour. If the deceased was driving 3 miles an hour, he would have gone about 25 feet in that time. He must, then, have been quite close on the south track when he was first seen. If the three or four employes of the defendant on and about the engine, looking along the track, did not discover him until he was so near to the point of actual collision, this is some evidence of the time when he could first have seen the train after passing the obstruction of the defendant and other interfering objects. He was then close upon the point of danger,—only the distance between the two tracks therefrom. Whether he could stop suddenly enough to avoid the danger, or could push on and get beyond it, was a question to be decided on the moment. He should not be held negligent for an error, if it was an error, of judgment, under those circumstances. It is easy for a court sitting at ease, and reading over the printed pages of a case, to say that one in the situation of the deceased ought to have done this, that, or the other; ought to have looked towards the four points of the compass; ought to have listened to all the sounds which might come from any direction; that if he heard or saw a train, he should have stopped; that if he did not see or hear it, then he ought to have seen or heard it. But the actual experience of the traveler is a different matter. On an examination of the case, we think that the evidence was such

that it was for the jury to decide whether the defendant was negligent, and also whether the deceased was guilty of contributory negligence. Judgment and order affirmed, with costs.